UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETERS GALLERY OF NEW YORK,
INC.,

Plaintiff,

23-CV-3181 (JPO)

-v-

OPINION AND ORDER

JOAN WEIANT and LEIGH BRENZA,

Defendants.

J. PAUL OETKEN, District Judge:

This case revolves around a series of Western American artworks that went missing from the Eberstadt family's collection in the 1970s and resurfaced decades later with Peters Gallery of New York, Inc. ("Peters Gallery").  Plaintiff Peters Gallery brings this declaratory judgment action to quiet title against Defendants Joan Weiant and Leigh Brenza, as successors-in-interest to Eberstadt & Sons ("the Eberstadts").  The Eberstadts assert counterclaims and third-party claims against Peters Gallery and Gerald Peters (collectively, the "Gallery Parties") for declaratory judgment, replevin, and conversion.  Before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, the Gallery Parties' motion for summary judgment is granted, and the Eberstadts' motion for summary judgment is denied.

I.    Background

A.    Factual Background

The following facts are taken from the parties' Local Rule 56.1 Statements (ECF No. 68 ("PSOF"); ECF No. 75 ("ESOF")) and are undisputed unless otherwise noted.

1.    The Missing Art

In the early twentieth century, Edward Eberstadt founded Eberstadt & Sons, a bookselling business in New York City that dealt in rare books and manuscripts, with a special

interest in the American West.  (ECF No. 20 ¶¶ 77-78; *see* ECF No. 31 ¶¶ 77-78.)  Over the years, Edward and his sons, Lindley and Charles Eberstadt, built a reputable collection of Western American art.  (ESOF ¶ 75.)  In the 1960s, Eberstadt & Sons sent approximately seventy-seven of its paintings offsite to Shar-Sisto, an art restoration company, "to clean, varnish, touch up frame, and coordinate photography."  (*Id.* ¶¶ 76-77 (quotation marks omitted).)  "Shar-Sisto confirmed that '[n]ever was there an agreement between the parties to do anything but clean, restore and repair the said paintings.'"  (*Id.* ¶ 78 (quoting ECF No. 69-13 ¶ 2).)  The parties agreed that Shar-Sisto "could handle the project during its 'slow time.'"  (*Id.* ¶ 80.)

In late 1969, upon receiving an offer to buy Eberstadt & Sons' collection, Lindley asked Shar-Sisto to return the paintings.  (*Id.* ¶ 81.)  Shar-Sisto returned most of the works in March 1970.  (*Id.* ¶ 82.)  However, seventeen paintings were missing.  (*Id.* ¶ 83.)  Among them are several artworks at issue in this case: Eanger Irving Couse's *Flute Courtship* ("the Couse"), Paul Frenzeny's *The Ambush* ("the Frenzeny"), Alfred Jacob Miller's *Mirage on the Prairie* ("the Miller"), John Archibald Woodside's *An Indian Buffalo Hunt* ("the Woodside"), Paul Kane's *Medicine Mask Dance* ("the Kane"), John Mulvaney's *Trappers of the Yellowstone* ("the Mulvaney"), Frederic Sackridge Remington's *Miners Prospecting for Gold* ("the Remington"), and Henry Balink's *Taos Indian Portrait* ("the Balink").  (PSOF ¶ 3.)

## 2.    The Search

Over the next few months, Lindley corresponded with Hillard Shar, the owner of Shar-Sisto, to locate the missing paintings.  (ESOF ¶ 84.)  In a March 16, 1970 letter, Lindley provided a list of twenty-eight paintings that were sent to Shar-Sisto and never returned.  (*See* ECF No. 69-14, ECF No. 61-12.)  In a November 9, 1971 letter, Lindley wrote to Shar that his wife had just passed away that summer, but he had finally gone through his records and compiled a list of twenty-six paintings "on deposit with [Shar-Sisto] which were not returned."

(ECF No. 61-14 at 1.)  Lindley asked Shar to make further searches before he would "resort[] to litigation against a longtime associate."  (ESOF ¶ 87; *see also* ECF No. 61-14 at 2.)  The Eberstadt family ultimately located some of the missing works, "as items were crossed off missing lists or annotated 'sold.'"  (PSOF ¶ 47; *see also* ECF No. 61-17 ("Most paintings still at Shar—a few sold—some may be here.").)

On July 13, 1972, Lindley "requested two fair market appraisals" from two art galleries—Kennedy Gallery and Bartfield—of the paintings that remained missing.  (PSOF ¶ 48.)  On June 20, 1973, Eberstadt & Sons asserted a conversion claim against Shar-Sisto in the Supreme Court of the State of New York, alleging that Shar-Sisto "failed and neglected to return to the plaintiff upon its demand" a list of seventeen paintings owned by Eberstadt & Sons.  (ECF No. 69-16; *see* ESOF ¶ 88.)  On May 24, 1974, the court dismissed Eberstadt & Sons's claim "as untimely by approximately three months."  (ESOF ¶ 91; *see* ECF No. 69-19.)

Following the case's dismissal, Lindley reported the missing works to the Art Dealers Association of America ("ADAA"), which had started "an art theft/notification system" in the 1960s.  (ESOF ¶¶ 92, 95.)  On November 6, 1974, the ADAA "issued a typewritten Theft Notice to its member galleries and certain auction houses and law enforcement" containing illustrations for "some but not all" of the paintings.  (PSOF ¶ 56.)  The parties vigorously dispute the reach and impact of the ADAA.  While the Eberstadts contend that "the ADAA was the only resource available for widespread dissemination of art thefts" at the time (ESOF ¶ 97), the Gallery Parties' expert opines that these Theft Notices "contained no information on the context of the loss, often lacked images, and had a very limited distribution," and "were not well known" outside the ADAA's distribution list.  (ECF No. 69-23 at 4.)

Charles Eberstadt passed away in 1974.  (PSOF ¶ 29.)  Lindley Eberstadt "was ill throughout the 1970s," dissolved Eberstadt & Sons in 1975, "and passed away in 1984."  (ESOF ¶¶ 98-99.)  Before his passing, Lindley gave a large folder of records about the missing artworks to his daughter, Defendant Joan Weiant, containing "documents from the 1973 lawsuits against Shar-Sisto, copies of his communications with Shar, and a copy of the Theft Notice."  (*Id.* ¶ 100.)  Lindley told Joan to "protect and keep the Theft Notice and have it ready for when something was flagged or returned or turned up."  (*Id.* ¶ 101 (cleaned up).)  Around that time, the Eberstadts contracted with Kennedy Gallery "to market the hundreds of artworks remaining from the Eberstadts' collection after the company's dissolution."  (PSOF ¶ 31.)

Since the 1970s, other organizations tracking art thefts have emerged.  The International Foundation for Art Research ("IFAR") "began collecting and disseminating information about art thefts" in 1976 and merged its efforts with the ADAA's in 1987.  (ESOF ¶¶ 102-03.)  "In 1991, IFAR licensed its records to the newly established private Art Loss Register ('ALR'), later expanding that license in 2004."  (*Id.* ¶ 104.)  Through these licenses, the ALR obtained records from the ADAA and digitized them over time.  (*Id.* ¶ 105.)  The ALR enables sellers and buyers to check for potential matches with lost items registered on its database.  (*Id.* ¶ 110.)

### 3.    The Gallery

As the Eberstadts were searching for their lost paintings in New York, Gerald Peters opened his first gallery in Santa Fe, New Mexico.  (PSOF ¶ 1.)  Peters began dealing art in the early 1970s, opened Peters Gallery in 1976, and specialized in "small value western art."  (ESOF ¶¶ 114-15.)  Between the late 1970s and the mid-1980s, "Peters purchased or took on consignment dozens of paintings" from a "small time" art dealer, Franklyn Gesner.  (PSOF ¶ 2; ESOF ¶ 120.)  Those paintings included the Couse, the Frenzeny, the Miller, the Woodside, the Kane, the Mulvaney, and the Remington.  (PSOF ¶ 3.)  Peters had worked with Gesner since the

1970s, during which time Gesner brought many other artworks to Peters and other dealers and auction houses.  (*Id.* ¶¶ 5-6.)

As Peters "establish[ed] himself as a major dealer" in Western art in the 1980s and 1990s, he marketed the artworks at issue and displayed several of them in traveling museum exhibitions. (*Id.* ¶¶ 9-10.)  In 1982, the Southwest Arts Foundation exhibited the Miller, on loan from Peters Gallery, in Houston, Texas.  (*Id.* ¶ 13.)  In 1984, another exhibition featured Peters's collection, including the Couse, in Houston.  (*Id.* ¶ 12.)  In 1998, an exhibition titled *The West Explored: The Gerald Peters Collection of Western American Art*, showing the Miller, the Kane, and the Woodside, traveled from California to Ohio, Colorado, Indiana, and Virginia.  (*Id.* ¶ 11.)  "The exhibitions were accompanied by catalogues illustrating the works and listing provenance information," including an Eberstadt provenance.  (*Id.* ¶ 14.)

Peters Gallery sold off the Mulvaney in 1982, the Couse in 1996, the Miller in 1994, the Kane in 1991, the Woodside in 1995, and the Remington in 1984.  (*Id.* ¶ 15.)  In some instances, Peters Gallery then re-acquired the artworks and resold them at auctions, including at Christie's, Sotheby's, and Phillip's.  (*Id.* ¶¶ 15-16.)  At one point in the early 2000s, Charles Eberstadt's daughter, Anne Hollander, "contacted Peters as a well-known dealer in art of the American West" to discuss selling the Eberstadts' art collection and provided Peters with the contact information of other Eberstadt family members, including Defendants.  (*Id.* ¶ 32.)

### 4.    The Discovery

In "the early 1990s, Peters opened the Santa Fe Auction House."  (ESOF ¶ 118.)  On February 23, 2021, the Santa Fe Auction House received an email from the ALR with a copy of the 1974 Theft Notice, which the auction house forwarded to Peters.  (*Id.* ¶ 119.)  Based on the Theft Notice, Peters Gallery generated "an artwork report from [its] old database . . . that [it] ha[d] matched up to artworks on the Eberstadt claim."  (*Id.* ¶ 126; *see also* ECF No. 69-1.)

Peters did not contact the ALR, the Eberstadts, or any of his clients about the Theft Notice. (ESOF ¶¶ 127-28.)

On June 4, 2018, the ALR informed the Eberstadts that one painting on the Theft Notice—the Mulvaney—was at Christie's for a planned auction. (*Id.* ¶ 129.) "In February 2019, the Mulvany was returned to the [Eberstadts]." (*Id.* ¶ 130.) Upon inspection of the painting, the Eberstadts discovered Peters Gallery's sticker on the verso, which prompted them "to inquire further about Peters'[s] potential involvement" with other missing works. (*Id.* ¶ 131.) The Eberstadts tried to locate the other paintings "by ordering catalogues from various galleries, including [Peters] Gallery, and searching newspapers and books for information about Peters and [Peters] Gallery." (*Id.* ¶ 132.) They nevertheless faced challenges that some paintings were "sold under different titles than those on the Theft Notice," and some were "sold through private sales with no public records." (*Id.* ¶¶ 133-35.)

On October 24, 2022, the ALR alerted the Eberstadts that another missing painting—the Couse—"had been flagged in advance of a Bonham's auction." (*Id.* ¶ 137.) The consignor, the George A. Bjurman Living Trust ("Bjurman Trust"), had bought the Couse from Peters Gallery in 1996. (*Id.* ¶¶ 137-38.) The Couse was blocked at the auction, prompting Bjurman Trust to "turn[] to Peters for resolution." (PSOF ¶ 26.) On November 7, 2022, counsel for Bjurman Trust "informed [Peters] Gallery of ALR's letter and indicated that it was considering rescinding the 1996 sale." (ESOF ¶ 138.) Counsel for Peters Gallery responded on December 12, 2022 that the Gallery "had acquired the Couse in 1994 at a well-publicized public auction." (*Id.* ¶ 139 (cleaned up).) On March 31, 2023, the Eberstadts wrote to Bonhams, demanding return of the Couse. (*Id.* ¶ 142.)

### B.    Procedural History

On April 17, 2023, Peters Gallery initiated this action against the Eberstadts for declaratory judgment to quiet title with respect to the Couse.  (ECF No. 1.)  Peters Gallery amended its complaint on May 5, 2023 (ECF No. 10) and again on September 11, 2023 (ECF No. 15).  On November 20, 2023, the Eberstadts filed an answer, as well as counterclaims against Peters Gallery and a third-party complaint against Peters.  (ECF No. 20.)  The Eberstadts asserted claims for declaratory judgment and replevin or conversion with respect to all seventeen "missing works" that Shar-Sisto had failed to return, "including without limitation the Couse, the Remington, the Miller, the Kane, and the Woodside."  (*Id.* at 18.)  On August 13, 2024, the Eberstadts amended their answer with the Court's leave.  (ECF No. 55; *see* ECF No. 54.)

On November 13, 2024, the Gallery Parties filed a motion for summary judgment on Defendants' counterclaims and third-party complaint (ECF No. 58), along with a supporting memorandum of law (ECF No. 60 ("P. Mem.")).  On January 10, 2025, the Eberstadts cross-moved for summary judgment on those claims (ECF No. 65), filing a memorandum of law in opposition to the Gallery Parties' motion and in support of their own motion (ECF No. 66 ("E. Mem.")).  The Gallery Parties replied on February 7, 2025.  (ECF No. 73 ("P. Reply").)  The Eberstadts further replied on February 28, 2025.  (ECF No. 76 ("E. Reply").)  The Court held oral argument on the cross-motions for summary judgment on June 18, 2025.  (ECF No. 81 ("Arg. Tr.").)

## II.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as

a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In deciding a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).

## III. Discussion

The artworks at issue fall into two categories: a single painting that the Gallery Parties still possess (the Couse) and multiple artworks that the Gallery Parties no longer possess (the "Resold Artworks").[1] The Gallery Parties argue that (1) for the Resold Artworks, the Eberstadts' conversion and replevin claims fail on the merits; and (2) for all artworks, the Eberstadts' claims are barred by the defense of laches. The Court examines each argument in turn.

### A. Conversion and Replevin Claims

Under New York law,[2] a tort of conversion "takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession," *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006), while "replevin is a remedy employed to recover a specific, identifiable item of personal property," *Heckl v. Walsh*, 122 A.D.3d 1252, 1254 (4th Dep't 2014). "Under New York's demand-and-refusal rule, 'an innocent purchaser of stolen goods becomes a wrongdoer only after refusing the owner's demand for their return.'" *Dist. Att'y of*

---

[1] "It is undisputed that, other than the Couse over which the Gallery Parties have constructive control . . . , none of the works claimed by the Eberstadts are in their possession or control." (P. Reply at 16; *see also* PSOF ¶ 15.)

[2] "The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law.'" *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (cleaned up).

*N.Y. Cnty. v. Republic of the Philippines*, 307 F. Supp. 3d 171, 199 (S.D.N.Y. 2018) (quoting

*Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150, 1161 (2d Cir. 1982)).  This doctrine

ensures that "a bona fide purchaser who performs no wrongful act relative to a plaintiff's goods"

has "an opportunity to deliver the property to the true owner, before he shall be made liable as a

tort feasor for a wrongful conversion."  *New York v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d

249, 260 (2002) (cleaned up).

      The parties do not dispute that Peters Gallery was a good-faith purchaser of the paintings

at issue.  (Arg. Tr. at 25:21-23.)  Nor do they dispute that the Eberstadts demanded return of the

paintings only in 2023—when the Gallery Parties no longer possessed any of the Resold

Artworks.  (*See* E Mem. at 17.)  That, according to the Gallery Parties, is dispositive:  "Where a

defendant lawfully obtains possession of property and has not wrongfully disposed of it, [a

replevin and conversion] action is not maintainable unless the defendant had possession of the

property at the commencement of the action."  *Gonzalez v. Port Auth. of N.Y. & N.J.*, 119

A.D.2d 628, 629 (2d Dep't 1986).  The Eberstadts counter that "New York allows a claim of

replevin to lie even if the defendant is no longer in possession of the property in question and,

moreover, even if the defendant initially acquired the property in good faith and for valuable

consideration."  *RH9 Grp., LLC v. Alon Zakaim Fine Art Ltd.*, No. 22-CV-9399, 2025 WL

71863, at *4 (S.D.N.Y. Jan. 10, 2025) (quotation marks omitted).

      The two lines of authorities cited by the parties are, in fact, not in conflict.  Parting with

property does not preclude an action for conversion if conversion had already occurred during

the possession period.  This may happen through wrongful acquisition, dealing, or disposition.

*See Leveraged Leasing Admin. Corp. v. PacifiCorp Cap., Inc.*, 87 F.3d 44, 50 (2d Cir. 1996)

("[T]heft or misappropriation . . . [or] exercising rights of ownership—by, for example, selling

property that you know belongs to someone else—constitutes conversion."). As the New York

Court of the Appeals has held, "in a case where the property is wrongfully taken by a person, or

lawfully taken and wrongfully transferred by him to another[,] . . . his actual or continued

possession at the time of its commencement[] is not essential to support an action against him on

behalf of the party entitled to possession to recover it." *Nat'l Steamship Co. v. Sheahan*, 122

N.Y. 461, 465 (1890). The "character of a good-faith possession" can also be changed by

wrongdoing during the possession, such as "'commercially exploiting' the property as [one's]

own" despite knowing the lack of right to do so. *See SongByrd, Inc. v. Est. of Grossman*, 206

F.3d 172, 174, 182-83 (2d Cir. 2000) (quoting *Sporn v. MCA Records, Inc.*, 58 N.Y.2d 482, 488

(1983)); *see also Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 212 (S.D.N.Y. 2019)

("[A] possessor openly dealing with property as her own . . . precludes the demand and refusal

rule if the possessor knew the property was not hers before doing so."). In such cases, where a

former possessor "perform[ed] [] wrongful act[s] relative to a plaintiff's goods" during its

possession, it can remain liable for conversion after disposing of the property.[3] *Seventh*

*Regiment Fund*, 98 N.Y.2d at 260.

By contrast, "[w]here the defendant has in good faith parted with the possession of the

property," no action for conversion or replevin can lie against the former possessor. *Gonzalez*,

---

[3] The cases cited by the Eberstadts are consistent with this principle. In *RH9 Group*, for example, defendants allegedly "wrongfully obtained and retained possession of the Painting." 2025 WL 71863 at *3. Several other decisions have held unknowing agents liable for wrongdoing directed by their principals. *See, e.g.*, *Ruffalo v. Coffaro*, 87-CV-1523, 1989 WL 83397, at *2-4 (E.D.N.Y. July 11, 1989), *aff'd*, 898 F.2d 137 (2d Cir. 1990) (holding business associate liable for unauthorized sale by gallery entrusted with valuing and marketing painting); *Page v. Clark*, 165 N.Y.S. 1058, 1062-63 (City Ct. 1917) (holding brokers liable for selling stock certificates at the request of wrongful owner); *Parker v. P & N Recovery of N.Y., Inc.*, 697 N.Y.S.2d 462, 466-67 (Civ. Ct. 1999) (holding auctioneers liable for conversion when principal lacked title or authority to sell).

119 A.D.2d at 629 (quotation marks omitted); *see also Nat'l Steamship Co.*, 122 N.Y. at 465
("[B]ecause the defendant neither unlawfully obtained possession of the tickets nor wrongfully
disposed of them[,] . . . the action was not maintainable unless the defendant, in judgment of law,
had the possession of them at the time of its commencement.").  Absent other wrongful conduct,
it is only "demand-and-refusal" that "changes the character of a good-faith possession before an
action for conversion or recovery of a chattel can be maintained." *SongByrd, Inc.*, 206 F.3d at
183 (cleaned up).  And to "ensure[]" that a bona fide purchaser has "an opportunity to deliver the
property to the true owner, before he shall be made liable as a tort feasor for a wrongful
conversion," *Seventh Regiment Fund*, 98 N.Y.2d at 260 (cleaned up), the demand-and-refusal
must occur during the possession period.

　　　The Eberstadts advocate for a rule that any party who had possessed the property at any
point must "deliver the property to the owner on demand, if it be still under his control, *or . . .
account to him for its value, if he ha[s] parted with it*."  (E. Mem. at 19 (emphasis in E. Mem.)
(quoting *Ross v. Cassidy*, 27 How. Pr. 416, 416 (Sup. Ct. Gen. Term 1864), as cited in *Chen v.
New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 456 (S.D.N.Y. 2014).).  Such a rule, unsupported by
binding authority, would subject every good-faith purchaser who committed no wrongdoing to
liability equivalent to the property's full value.  It would also allow owners of lost property to
potentially recover many times the value of their property from successive possessors and,
indeed, incentivize them to delay taking action so that the property would pass through more
hands.  These dramatic results "would constitute a wholesale rejection of the demand and refusal
rule that has governed the accrual of conversion claims in New York since the mid-20th
century," *cf. Republic of Turkey*, 425 F. Supp. 3d at 213, which provides that "[o]ne who comes
lawfully into possession of property cannot be charged with conversion thereof until after a

demand and refusal, except in a case where the lawful custodian of property commits an overt and positive act of conversion by an unlawful disposition of the same," *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) (cleaned up).  The Eberstadts' proposition is thus erroneous.

The Eberstadts do not argue that the Gallery Parties committed any wrongdoing when they acquired, possessed, or disposed of the Resold Artworks.  (*See* Arg. Tr. at 25:17-20 ("disavow[ing] . . . entirely" argument of "any bad faith on the part of Mr. Peters"); *see also* E. Mem. at 17-19, E. Reply at 7-9.)  They argue only that the Gallery Parties "refused to return . . . equivalent value" of the Resold Artworks in 2023, when the Eberstadts eventually demanded return of artworks that the Gallery Parties no longer possessed.  (E. Reply at 8.)  Under New York law, the Eberstadts cannot maintain a conversion or replevin action against the Gallery Parties for these Resold Artworks.[4]  The counterclaims and third-party claims for the Resold Artworks—all artworks other than the Couse—are therefore dismissed.

### B.    Laches Defense

The Gallery Parties further argue that the Eberstadts' counterclaims and third-party claims for all paintings, including the Couse, are barred by the affirmative defense of laches.  (*See* P. Mem. at 14-28.)  Laches is "an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party."[5]  *Saratoga Cnty. Chamber of*

---

[4] The Gallery Parties also argue that the claims as to the Resold Artworks are barred by the statute of limitations, which began to run when they "dispose[d] of the property" decades ago.  (*See* P. Mem. at 12 (quoting *Oliver v. Boone*, 194 A.D.3d 525, 525 (1st Dep't 2021)).)  For the exact reason that the Gallery Parties prevail on the merits—in other words, no conversion or replevin claim had accrued upon the lawful disposal—they are mistaken in their statute of limitations argument.

[5] "Laches is not a defense to a legal action where damages are requested. . . . However, laches may be invoked where, as here, declaratory or other equitable relief is requested."  *Kamat v. Kurtha*, No. 05-CV-10618, 2008 WL 5505880, at *7 (S.D.N.Y. Apr. 14, 2008), *report and recommendation adopted*, 2009 WL 103643 (S.D.N.Y. Jan. 15, 2009); *see also, e.g.*, *Republic of*

*Com., Inc. v. Pataki*, 100 N.Y.2d 801, 816 (2003).  "In the context of claims of lost or stolen works of art or cultural artifacts, the doctrine of laches safeguards the interests of a good faith purchaser of lost or stolen art by weighing in the balance of competing interests the owner's diligence in pursuing his claim."  *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, No. 98-CV-7664, 1999 WL 673347, at *7 (S.D.N.Y. Aug. 30, 1999) (cleaned up).  While "[t]he existence of laches is a factual question that requires the court to weigh the equities of each case," *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 193-94 (2d Cir. 2018) (quotation marks omitted), "laches may be decided as a matter of law when the original owner's lack of due diligence and prejudice to the party currently in possession are apparent," *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019) (cleaned up).

"A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."  *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998).  The Eberstadts do not dispute the first element (*see* E. Mem. at 23-29; E. Reply at 10-12), which requires only that "a plaintiff 'should have known' of the injury," *Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 71 (2d Cir. 2023) (quoting *Phil. Am. Lace Corp. v. 236 W. 40th St. Corp.*, 822 N.Y.S.2d 25, 27 (1st Dep't 2006)).  The Eberstadts undisputedly became aware that their paintings went missing by the early 1970s, at which point they knew or should have known of their potential claim.[6]  To prevail on a laches defense, the Gallery Parties must then establish the other two elements: unreasonable delay and prejudice.

---

*Turkey v. Christie's Inc.*, 62 F.4th 64, 67 (2d Cir. 2023) (holding that plaintiff's declaratory judgment, conversion, and replevin claims are barred by laches).

[6] This distinguishes this case from several cases cited by the Eberstadts, where factual disputes as to whether and when the plaintiffs should have known their injuries precluded summary judgment.  *See Schoeps v. Museum of Mod. Art*, 594 F. Supp. 2d 461, 468 (S.D.N.Y.

1.    **Unreasonable Delay**

Unreasonable delay turns on whether the Eberstadts "engaged in a diligent search for the missing artwork during the period between when the [] [p]aintings went missing . . . and the filing of the lawsuit." *Platt as co-trustees of Platt Fam. Artwork Tr. v. Michaan*, 695 F. Supp. 3d 420, 446 (S.D.N.Y. 2023).  While the parties vigorously contest the adequacy of the steps that the Eberstadts undertook in search of the missing artworks, there is little factual dispute as to what those steps were:  Upon realizing that some paintings went missing in 1970, Lindley Eberstadt worked with Shar-Sisto in an attempt to locate them.  (ESOF ¶¶ 82-85.)  In 1973, Eberstadt & Sons brought suit against Shar-Sisto, but the case was dismissed for falling outside the three-year statute of limitations.  (*Id.* ¶¶ 88, 91.)  In 1974, Lindley reported the missing works to the ADAA, which issued a Theft Notice.  (*Id.* ¶¶ 92, 96.)  In the next four decades, as Eberstadt & Sons dissolved and Lindley passed away, the Eberstadt family, including Defendant Weiant to whom Lindley passed on the files about the missing paintings, took no further action in relation to those paintings, until the family received an alert from the ALR in 2018.  (*Id.* ¶¶ 98-100, 129.)  Based on these undisputed facts, the Court recognizes that the Eberstadt family made *some* efforts in search of the missing art, but concludes that these efforts are ultimately inadequate as a matter of law.

Two cases are analogous and instructive.  In *DeWeerth v. Baldinger*, the Second Circuit analyzed laches in "a dispute over ownership of a painting by Claude Monet that disappeared

---

2009) ("Summary judgment is inappropriate at the stage because genuine questions of fact exist as to, *inter alia*, whether Elsa knew she had a potential claim to the Paintings during her lifetime."); *SEC v. Collector's Coffee, Inc.*, No. 19-CV-4355, 2023 WL 3575428, at *15 (S.D.N.Y. May 22, 2023), *report and recommendation adopted*, 2023 WL 3862662 (S.D.N.Y. June 7, 2023) ("[A] jury could draw different inferences from the various news articles and conclude that the Holders had not met their burden of showing that O'Malley should have known that the Contracts were being improperly held by Kelly.").

from Germany at the end of World War II and ha[d] been in the possession of a good-faith purchaser for the last 30 years."  836 F.2d 103, 104 (2d Cir. 1987).  DeWeerth, the original owner, discovered the loss of the Monet in 1945, reported it to the military government in 1946, inquired of an attorney about possible recovery in 1948, enlisted the help of an art professor to investigate the painting's whereabouts in 1955, and reported the loss to the West German federal bureau of investigation in 1957.  *Id.* at 105.  Nevertheless, the Second Circuit concluded that "DeWeerth's investigation was minimal," noting the cursory fashion of her reports to authorities and the aborted efforts when the attorney and art professor indicated their inability to help.  *Id.* at 111.  The Second Circuit went on to state:

> Most indicative of DeWeerth's lack of diligence is her failure to conduct any search for 24 years from 1957 until 1981.  Significantly, if DeWeerth had undertaken even the most minimal investigation during this period, she would very likely have discovered the Monet, since there were several published references to it in the art world.

*Id.* at 112.  The *DeWeerth* court contrasted this with *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 850-52 (E.D.N.Y. 1981), *aff'd*, 678 F.2d 1150 (2d Cir. 1982), where the owner informed numerous art museums and military agencies of specific facts surrounding the theft and reported the loss to two publications listing stolen works of art and several organizations set up to locate art stolen during the war, which constituted reasonable diligence.  *DeWeerth*, 836 F.2d at 110-11.

    *Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.* similarly involved the attempt to recover a painting allegedly misappropriated and sold in the World War II period.  300 A.D.2d 117 (1st Dep't 2002).  There, the Wertheimers "had the painting included on a list of stolen artworks published by the French government in 1947," but "plaintiff's grandfather abandoned the French legal proceeding he commenced against [the seller] after the war."  *Id.* at 118.  In granting summary judgment based on laches, the court emphasized that "for nearly half a century

prior to the commencement of this action in 2000, the Wertheimers failed to take any steps to recover the painting," and noted that "the family did not make any inquiries . . . based on a New York gallery's advertisement of the painting for sale in a prominent art journal in 1951, notwithstanding that plaintiff's grandfather then lived in New York." *Id.* at 117-18.

The Court observes several similarities across *DeWeerth*, *Wertheimer*, and this case. In all three cases, the owner promptly reported the lost paintings to either local authorities or published lists of stolen artworks. After some active efforts to locate the art in the initial years, the owner dropped the search for several decades. In addition, the owner made no inquiry despite open advertisement, exhibition, and/or publishing of the paintings in the art world. Placing due weight on these facts, both *DeWeerth* and *Wertheimer* held that laches barred the plaintiffs' claims. Similar cessation of efforts and missed opportunities are present in this case: The Eberstadts made no active efforts to search for the paintings between 1974 and 2018,[7] despite the fact that Peters Gallery openly marketed those artworks and displayed them in several exhibitions around the country. Indeed, several of the artworks were publicly exhibited, listed in catalogues, and sold through prominent auction houses throughout the 1980s and 1990s. The fact that an Eberstadt heir had connected with Peters in the early 2000s (PSOF ¶ 32) further suggests that the Western American art world is a small one, where some investigative inquiries could have led to earlier discovery of the missing paintings. As the Gallery Parties point out, "it is not mere hindsight to expect the Eberstadts to have made occasional inquiries among dealers,

---

[7] The Eberstadts gesture at the idea, without citing any authority, that under a "principal-agent" theory, the ongoing work of the ADAA can be "imputed to the [Eberstadt] family, who enlisted the aid of the ADAA (and later ALR) to continue search efforts on their behalf." (E. Mem. at 25; E. Reply at 11.) But under New York law, "[t]he principal's power to control the agent is an essential element of an agency relationship," *Mouawad Nat. Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422 (S.D.N.Y. 2007), and the record is devoid of any evidence that the Eberstadts controlled the ADAA's operations.

museums, and auction houses, to ask the manager of their large remaining art assets, Kennedy Galleries, to keep an eye out for the works, to monitor museums and auction houses specializing in Western art, to show Gerald Peters the Theft List in the early 2000s when they were considering consigning their collection to him and ask him if he had come across any of the works, [and] to start using the internet once it became available." (P. Reply at 26.) Based on these facts, the Court concludes that the Eberstadts unreasonably delayed taking action in search of the missing paintings.

### 2. Prejudice

"The mere lapse of time, without a showing of prejudice, will not sustain a defense of laches." *Saratoga Cnty. Chamber of Com.*, 100 N.Y.2d at 916. "However, a showing that the lapse of time has led to 'deceased witnesses, faded memories, and hearsay testimony of questionable value, as well as the likely disappearance of documentary evidence' is sufficient to demonstrate prejudice." *Howard Univ. v. Borders*, 588 F. Supp. 3d 457, 480 (S.D.N.Y. 2022) (quoting *Zuckerman*, 928 F.3d at 194) (cleaned up).

Because there is no dispute that Peters purchased the paintings from Frank Gesner in good faith, the key missing link is how Gesner acquired the paintings. If Gesner had stolen the paintings or bought them from a thief, the Gallery Parties would not have good title. *See Bakalar v. Vavra*, 619 F.3d 136, 140 (2d Cir. 2010) ("[I]n New York, a thief cannot pass good title."). If, instead, the Eberstadt family had authorized the sale to Gesner or his predecessor(s), the Gallery Parties would have good title. Yet, much evidence—including evidence that could have shed light on how the missing paintings went from Shar-Sisto to Gesner—has been lost. Both principals of Eberstadts & Sons have passed away, Charles in 1974 and Lindley in 1984. (PSOF ¶¶ 29-30.) The then-principal of Shar-Sisto, Hillard Shar, died in 1979, and the present owner, Larry Shar, only began working at Shar-Sisto in the 1970s. (*Id.* ¶¶ 69-70.) Gesner

himself is 81 years of age (*id.* ¶ 71); his wife's affidavit states that he "has been diagnosed with dementia and his memory for events some forty years ago is very poor" (ECF No. 61-8 ¶ 11), and Gesner testified during his deposition that he did not recognize the paintings on the Theft Notice (ECF No. 61-4 at 6:25-7:06).  The only remaining documentary evidence from the period of the loss is a file that Lindley Eberstadt passed on to Joan Weiant before his death, containing one-sided and potentially self-serving documents "from the 1973 lawsuits against Shar-Sisto, copies of his communications with Shar, and a copy of the Theft Notice."  (ESOF ¶ 100.)  No documents originating from Shar-Sisto about the missing paintings remain.

The Eberstadts contend that any lost evidence would not have helped the Gallery Parties' case, arguing that the suggestion that Shar-Sisto might have lawfully sold the paintings is but a "'metaphysical' possibility."  (E. Mem. at 16 (quoting *Howard Univ.*, 588 F. Supp. 3d at 463).) It is true that Shar represented in the 1973 litigation that "[n]ever was there an agreement between the parties to do anything but to clean, restore and repair the said paintings . . . ."  (ECF No 69-13 at 3.)  But it is also true that the Eberstadt family had crossed off items or annotated "sold" on its lists of missing paintings.  (PSOF ¶ 47.)  Had this case been brought decades earlier, the Eberstadt family and Shar could have testified about what transpired between them and what the handwritten notes meant, and Gesner might have recalled where he got the paintings from "seeing labels on the back of . . . the artworks" (ECF No. 69-5 at 62:18-20).  Five decades later, this Court is left with an ambiguous record and evidentiary gaps.  The Eberstadts' delay in bringing suit has impeded the Gallery Parties' ability to defend their title by establishing good-faith purchases of their predecessors.  *Cf., e.g.*, *DeWeerth*, 836 F.2d at 112 (holding that a thirty-year delay prejudiced a good-faith purchaser where "the only witness who could verify what happened to the Monet in 1945 is dead" and "[k]ey documents . . . are missing");

*Wertheimer*, 300 A.D.2d at 118 (finding prejudice where a fifty-year delay made it "virtually impossible for de Sarthe to prove that any of its predecessors in interest acquired good title"); *In re Peters*, 821 N.Y.S.2d 61, 69 (1st Dep't 2006) (holding that a seventy-year delay "has prejudiced the good-faith purchaser since none of the parties to the original sale of the painting . . . are alive").[8]  Thus, the Gallery Parties have demonstrated prejudice.

### 3.    Unclean Hands

Finally, the Eberstadts argue that the doctrine of unclean hands precludes the Gallery Parties from asserting their laches defense, because "[w]hen the Gallery Parties received the Theft Notice in 2021, featuring eight paintings that had passed through their hands—in some instances, multiple times—they literally did nothing to notify the ALR, law enforcement, their own clients, or the Eberstadts," nor did Peters Gallery mention the Theft Notice in its complaint. (E. Mem. at 28-29.)  "Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is 'directly related to the subject matter in litigation' and has injured the party attempting to invoke the doctrine." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) (quoting *Amarant v. D'Antonio*, 602 N.Y.S.2d 837, 838 (1993)).  Here, the Eberstadts have not shown

---

[8] The cases that the Eberstadts rely on involve either a much shorter delay, limited loss of evidence, or the absence of legal theory to title.  *See Reif v. Nagy*, 175 A.D.3d 107, 132 (1st Dep't 2019) (no evidence was lost between defendants' acquisition of artworks in 2013 and plaintiffs' demand for the return); *Love v. Spector*, 215 A.D.2d 733, 734 (2d Dep't 1995) (defendants had "ample documentary evidence"); *Abbott Labs. v. Feinberg*, 506 F. Supp. 3d 185, 200 (S.D.N.Y. 2020), *aff'd*, No. 21-45, 2023 WL 19076 (2d Cir. Jan. 3, 2023) (no documentation was lost between 2003 and 2020, defendants had two prior interviews with the key deceased witness, and they failed to "explain how any testimony from [other deceased] witnesses would contradict the factual record in this case"); *In re Flamenbaum*, 22 N.Y.3d 962, 966 (2013) ("[A]lthough the decedent's testimony may have shed light on how he came into possession of the tablet, we can perceive of no scenario whereby the decedent could have shown that he held title to this antiquity.").

prejudice resulting from any unconscionable conduct on the Gallery Parties' part.  Despite the allegation that the Gallery Parties concealed information about the paintings' whereabouts in 2021, the Eberstadts "seem[ed] to have found 5 of the . . . missing paintings"—the Couse, the Kane, the Miller, the Woodside, and the Remington—in addition to the Mulvaney back in 2019. (ECF No. 74-4 at 1-4.)  The Eberstadts appear to have located the other two paintings—the Frenzeny and the Balink—shortly thereafter, during discovery in this case (*see* P. Mem. at 11 n.2), with no injury identified from the three-year delay.  Therefore, even if the Gallery Parties had failed to follow "the [ADAA] Code of Ethics"[9] or "best industry practices for art dealers" (E. Mem. at 29), the Eberstadts have suffered no prejudice as a result, and thus the doctrine of unclean hands does not bar the Gallery Parties' laches defense.  *Cf. Wertheimer*, 300 A.D.2d at 118-19 ("The doctrine of unclean hands does not bar de Sarthe's assertion of the laches defense, since de Sarthe's alleged inequitable conduct—its alleged failure to make reasonable inquiry into the background of the painting prior to purchasing it in 1999, and its alleged creation and use of a false provenance as an aid to attempts to resell the painting—did not cause any prejudice to plaintiff."); *Peters*, 821 N.Y.S.2d at 69 ("[T]he doctrine of unclean hands does not preclude consideration of the laches defense because the Otten family's alleged attempt to create a false provenance for the painting did not prejudice respondent.").

Because the Eberstadts' unreasonable delay in bringing suit to recover the lost paintings has prejudiced the Gallery Parties, the Eberstadts' claims regarding the artworks are barred by laches.  Therefore, the Eberstadts' counterclaims and third-party claims are dismissed.

---

[9] According to the ADAA, its Code of Ethics is a "resource" to "guide" its members, "not a statement of what Members' legal obligations are or should be."  (ECF No. 69-4 at 16.) Further, there is no evidence that the Gallery Parties have ever been members of the ADAA.

**IV.     Conclusion**

For the foregoing reasons, Plaintiff and Third-Party Defendant's motion for summary

judgment on Defendant's counterclaims and third-party complaint is GRANTED, and

Defendants' motion for summary judgment on those claims is DENIED.

The parties are directed to confer and submit a joint letter proposing further proceedings,

if any, on Plaintiff's claim for declaratory judgment on or before August 22, 2025.

The Clerk of Court is directed to close the motion at Docket Numbers 58 and 65.

SO ORDERED.

Dated:  August 1, 2025
        New York, New York

                                              _____
                                                     J. PAUL OETKEN
                                                United States District Judge